NOT DESIGNATED FOR PUBLICATION

Nos. 118,652
118,653
118,654

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTERESTS OF N.M., N.T., and D.K.,
Minor Children.

MEMORANDUM OPINION

Appeal from Cowley District Court; NICHOLAS M. ST. PETER, judge. Opinion filed June 8, 2018. Affirmed in part, reversed in part, and dismissed in part.

*Jennifer Anne Passiglia*, of Law Office of Jennifer Passiglia, of Winfield, for appellant natural mother.

*Ian T. Otte*, deputy county attorney, for appellee.

Before STANDRIDGE, P.J., GREEN and MCANANY, JJ.

PER CURIAM: In these three consolidated cases three children ages 1, 9, and 10 were found to be children in need of care (CINC). Mother appeals, claiming that drug tests admitted at the adjudication hearing were improperly admitted into evidence and that there was insufficient evidence for the district court to designate all three of her children as CINC.

*Facts*

Mother began taking pain killers and methamphetamine to control her pain after a back injury at work. She became addicted to these drugs and used them while she was pregnant with her youngest child. She wound up in the hospital because of her drug use.

1

While Mother was in the hospital, the Kansas Department of Children and Family Services (DCF) found out about her drug use while pregnant. A DCF investigator encouraged Mother to get help for her drug problem. After she got out of the hospital, Mother told the DCF investigator that she could not attend a treatment program because she had to care for her children. She told the investigator that she had used methamphetamine, but she did not believe it was a big deal because everyone tried it. DCF closed its investigation in August 2015 because it believed Mother was addressing her drug problem.

Mother's youngest child was born in November 2015. At that time DCF received a second report about Mother's continued drug use while pregnant. The DCF investigator again met with Mother who again admitted to her drug use while pregnant. The investigator initially attempted to follow up with Mother in person and through correspondence, but she was unable to personally contact Mother, and Mother did not respond to the investigator's letter. The investigator finally met with Mother in January 2016 at Mother's home, where the investigator observed that the newborn appeared to be healthy. DCF again closed its investigation.

In May 2016, DCF opened its third investigation upon receiving a report that Mother was physically neglecting the infant and failing to adequately supervise the older two children. A different DCF investigator took over the file and contacted Mother, who stated that she was not currently doing drugs and was only drinking a little bit. The investigator made numerous attempts to meet the children but to no avail, so in July 2016 the file was again closed.

Later, Mother admitted that she was using drugs in January and February 2017, but she stated she did not use drugs while her children were present.

In April 2017, Mother was involved in a single-car accident in which she ran into a tree while taking the older children to school. All three children where in the car at the time. Mother claimed the accident occurred when the steering wheel on her car locked. Mother was arrested for driving with a suspended driver's license but apparently was not driving under the influence at the time, though DCF later received a report that she was high on methamphetamine at the time. Mother was booked into the county jail.

A third DCF investigator took over the file. When she met with Mother in May 2017, Mother denied using drugs at the time of the accident. Though she did not state when she had last used opiates, she claimed the last time she had used methamphetamine and marijuana was in January and February 2017. Mother agreed to a safety plan that required her and the children to submit to a drug screen and for her to get a drug and alcohol evaluation, to follow any recommendation from the evaluation, and to complete family preservation services. When the drug tests were administered, Mother tested positive for morphine. Mother acknowledged that she had a problem with opiates, which she obtained without a prescription. The children were given hair follicle tests. The older children's test results were negative. The youngest child tested positive for contact with methamphetamine within 90 days of the test, due either to prolonged exposure to the drug or actually ingesting the drug. The children were taken into protective custody. The older children were placed with their grandmother.

On May 31, 2017, the State initiated CINC proceedings for all three children. The court entered ex parte temporary custody orders, to which Mother lodged her objection. The court held the temporary custody hearing in June 2017.

In July 2017, the State gave notice of its intent to issue business records subpoenas, to which Mother objected on the grounds that the records contained protected health information, were hearsay, and lacked a foundation for being admitted as scientific

evidence. The court overruled Mother's initial objection and took her other objections under advisement.

The adjudication hearing was held in September 2017. Over Mother's objection, the court allowed evidence offered by the State regarding all of the earlier DCF investigations of Mother. The court took under advisement the admissibility of the drug test results but ultimately included the drug test results in its decision.

In October 2017, the court adjudicated all three children to be in need of care. With regard to the youngest child, the court found clear and convincing evidence that this one-year-old was at risk and without the care or control necessary for his physical, mental, or emotional health. Because of his age, this child relied on Mother for all his needs, and Mother had voluntarily exposed him to drugs in utero while she was pregnant and again sometime within 90 days of the drug screen, which disclosed his exposure to methamphetamine. Mother admitted that she has an opioid addition but she failed to address it.

The court found that there was insufficient evidence that Mother's drug use affected either of the two older children or the care they received. Nevertheless, the court found them to also be in need of care because they were in the home of their younger sibling who had now been designated a CINC.

Mother's appeal now brings this matter before us.

*Ex Parte Order of Protective Custody*

Mother's first claim is that the district court erred in issuing its initial ex parte order of protective custody. She claims the children were not likely to be harmed if they were not immediately taken from their home, that removing the children from their home

4

was contrary to their welfare, and that DCF made no reasonable efforts to maintain the family unit before seeking to have the children removed from their home.

The State argues that we have no jurisdiction to hear the appeal of an ex parte order entered under K.S.A. 2017 Supp. 38-2242.

This claim raises an issue of law, which we review de novo. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015). The right to appeal is found only in our statutes. Except for certain exceptions that do not apply here, we can consider an appeal only if the appeal is taken in a manner spelled out in our statutes. *Wiechman v. Huddleston*, 304 Kan. 80, 86-87, 370 P.3d 1194 (2016). We interpret the applicable statutes independent of the analysis the district court conducted. *City of Dodge City v. Webb*, 305 Kan. 351, 356, 381 P.3d 464 (2016).

In *In re N.A.C.*, 299 Kan. 1100, Syl. ¶ 3, 329 P.3d 458 (2014), our Supreme Court held that K.S.A. 2012 Supp. 38-2273(a), which identifies the orders that may be appealed in a CINC case, specifically limits appeals to orders of temporary custody, adjudication, disposition, and a finding of unfitness or the termination of parental rights. "If an order in a child in need of care case does not fit within these five categories, it is not appealable." 299 Kan. 1100, Syl. ¶ 3.

The "order of temporary custody" described in *In re N.A.C.* does not include ex parte orders under K.S.A. 2017 Supp. 38-2242. See 299 Kan. at 1116. The ex parte order entered in this case was a short-term order in effect only until the temporary custody hearing occurred. The order of temporary custody is appealable, but the ex parte order entered in this case is not. See K.S.A. 2017 Supp. 38-2273(a). As a result, we do not have jurisdiction to consider this claim. This claim is dismissed.

5

*Temporary Custody Order*

Mother next claims that there was insufficient evidence to support the district court's temporary custody order because the State did not have probable cause under K.S.A. 2017 Supp. 38-2243(f) and K.S.A. 2017 Supp. 38-2243(i).

The State contends this issue is moot because the temporary custody order is no longer in place now that the children have been determined to be CINC and a disposition placement order has been entered.

An issue is moot if there is no longer a justiciable controversy between the parties. See *State v. Bennett*, 288 Kan. 86, 89, 200 P.3d 455 (2009). To be a "justiciable controversy" there must be a definite and concrete dispute between the parties and adverse legal interests that are immediate, real, and for which a court can provide conclusive relief. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). As a matter of policy, we generally do not decide moot questions or issue advisory opinions. *State v. McKnight*, 292 Kan. 776, 778, 257 P.3d 339 (2011). Our focus is on real controversies that affect the legal rights of the parties. See *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 (2012). Here, the temporary custody order and the justiciable controversy over the temporary custody order ended when the district court found that the children were in need of care and made a disposition order for placement of the children. See *In re A.E.S.*, 48 Kan. App. 2d 761, 765, 298 P.3d 386 (2013).

Mother recognizes this mootness problem, but she contends it should not bar us from considering the issue because it concerns a matter of public importance in that the temporary custody order substantially alters the fundamental relationship between parent and child. Further, the harm is capable of repetition and is being repeated routinely in CINC proceedings. See *State v. DuMars*, 37 Kan. App. 2d 600, 605, 154 P.3d 1120, *rev. denied* 284 Kan. 948 (2007).

6

But an issue does not satisfy the requirements of this exception to the mootness policy when resolution of the issue is not based on broad legal principles that could apply to a multitude of cases, but rather turns on individual facts specific to the particular case on appeal. See *In re A.E.S.*, 48 Kan. App. 2d at 766. In *In re A.E.S.*, the issue was the sufficiency of the evidence to support the court's interim order. The disposition order resolved the evidentiary issues in the case, and any further consideration would be case specific and therefore would not satisfy any exception to the mootness doctrine.

Applying the holding of *In re A.E.S.*, we conclude that the claimed exception to the mootness doctrine does not apply to the fact specific order for temporary custody in this case. Thus, we will not address the substance of this claim. This claim is dismissed.

*Drug Test Results as Business Records*

Next, Mother contends that the district court abused its discretion in admitting the drug test results into evidence as business records. She argues there was insufficient evidence for the court to determine that the business records were trustworthy. We evaluate the admission of evidence using the abuse of discretion standard of review. *Decker & Mattison Co. v. Wilson*, 273 Kan. 402, 411, 44 P.3d 341 (2002).

Under our rules of evidence, business records under K.S.A. 2017 Supp. 60-460(m) are an exception to the rule against the admission of hearsay evidence if: "(1) [the records] were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." Under K.S.A. 2017 Supp. 60-460(m) "the affidavit or declaration of the custodian shall be prima facie evidence that the records satisfy the requirements of this subsection."

7

Mother contends the district court erred in admitting the records into evidence when the records custodian's affidavit did not attest (1) to the trustworthiness of the procedures used to produce the test results, (2) to the education or training of the scientists who conducted the tests, or (3) to the fact that the scientists followed the proper protocol and procedures for the tests.

The documents at issue were produced at Quest Diagnostics, a medical lab that routinely performs blood, urine, and other tests for medical care providers and others. Quest's records custodian submitted his affidavit showing that: (1) he is the custodian of the business records of Quest Diagnostics; (2) the test results are true and exact copies of the laboratory results; (3) the laboratory results were kept in the ordinary course of business by persons with personal knowledge of the information recorded; and (4) the information was recorded at or near the time of its occurrence. This information is sufficient to comply with K.S.A. 2017 Supp. 60-460(m). We will address Mother's other arguments regarding the reliability of these records in our discussion of Mother's next claim.

*Reliability of the Drug Test Results*

Mother claims the district court abused its discretion in admitting the Quest business records without an adequate scientific foundation. Once again, this is a claim we evaluate using the abuse of discretion standard of review. *Decker & Mattison Co.*, 273 Kan. at 411.

In *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015), our Supreme Court held that the foundation requirements for the admission of scientific evidence require a showing that (1) the test samples were collected under appropriate conditions to guard against contamination, (2) the samples were properly marked and conveyed to the laboratory, (3) the chemical testing was properly conducted

8

by competent personnel, and (4) the test results are relevant and material to the issues presented in the litigation. In our present case the test results clearly were relevant and material to the issues before the district court. Therefore we will focus on the other foundation requirements.

The specialist who collected the hair samples from Mother's youngest child testified that when she collected the child's hair sample, she took out a new collection kit and used a mirror to make it clear to Mother that she was cutting the child's hair and not her own. Mother was present to observe that the specialist took the hair sample from her child. Before taking the sample the specialist cleaned the hair clip and the scissors with alcohol to ensure that there would not be any contamination. She then clipped small portions of hair from the child's head. As soon as she clipped the hair, she wrapped it in a sterilized foil and placed the foil in a yellow envelope. She then took a security seal from the chain of custody form and sealed the envelope. There were numbers on the seal and the chain of custody form that ensured that the items matched. The specialist showed the security seal and the envelope to Mother and read off the numbers on the chain of custody form so Mother could confirm that the items matched. Mother then signed the envelope, stating that the numbers matched. She initialed the seal stating that she saw the specialist cut her child's hair, place the sample in the envelope, and seal the envelope. The specialist then sent the child's hair sample to Quest Diagnostics for testing.

This testimony was sufficient for the trial court to find that the child's hair sample was collected under appropriate conditions to avoid contamination and that the sample was properly marked and conveyed to the laboratory for testing.

A different specialist collected the urine sample from Mother. She testified that she had Mother lock up anything that she had in her pockets before going into the bathroom to obtain the sample. Once Mother was in the bathroom, the specialist had Mother wash her hands with water only. She explained to Mother that there was dye in

the toilet and Mother was not to flush the toilet in order to ensure that nothing was flushed away. The specialist gave Mother a couple of cups that were completely sealed. Mother picked her cup, and the specialist unsealed it. There was a temperature gauge in the cup to assure that the sample was at body temperature. Mother obtained the sample while in the bathroom and then brought the sample out of the bathroom and placed it on the counter. Mother remained in visual contact with the urine sample until it was packaged. The specialist packaged the sample and took a security seal from the chain of custody form and sealed the package. Mother initialed the seal. Mother sighed the bottom of the entire package indicating that the urine sample was hers. The specialist then placed the sealed package in the lockbox that was designated for Quest Diagnostics.

All of this constituted sufficient evidence from which the district court could find that Mother's urine sample was collected under appropriate conditions to avoid contamination and was properly marked and conveyed to Quest Diagnostics.

But Mother also contends that there is no evidence that the testing was completed by competent personnel. For support she notes that the actual names of those who completed the tests are unknown. The persons who performed the tests are identified only by a number on the test reports. Mother also asserts that there is nothing to indicate that these scientists have the proper education or training to complete the tests.

The State points out that the affidavits offered in support of the testing showed that the lab was certified by the Department of Health and Human Services. From this evidence the district court could reasonably infer that Quest Diagnostics would not be certified by the State if its lab personnel were not qualified to conduct the tests that are the essence of Quest's business. Further, the person testing each sample was identified by a unique number, making that person accountable for his or her testing work. Applying the abuse of discretion standard, we find no error in the court using this testimony in

10

determining that the foundation for the test results was sufficient for their admission into evidence.

As a final point on this issue, Mother contends there is no evidence that scientists used proper procedures in testing of the samples. Relying on *Wiles*, 302 Kan. at 66, she argues that the affidavit offered in support of the testing procedures was inadequate to show that the testing procedures were proper because the affiant did not have personal knowledge of the actions taken by the scientists. The State contends that the affiant claimed to have personal knowledge of the procedures used to test the samples in question.

In *Wiles*, the person who performed the test did not place his initials next to the test as was required by hospital procedure. Further, no one testified at trial that the procedure was handled correctly. But the evidence in our present case meets the *Wiles* standard. Here, the personnel who completed the tests were identified by their individual personnel number, and their reported test results were obtained by a mass spectrometer. Further, the affiant stated that she had personal knowledge of the procedures used to test the actual samples in question. There was sufficient evidence that the personnel used the proper procedure when testing the samples and that the tests were administered by competent personnel. The district court did not abuse its discretion in admitting the Quest Diagnostics test results.

*Sufficiency of the Evidence that Mother's Youngest Child was a CINC*

For her penultimate issue, Mother claims the evidence was insufficient to support the decision that her youngest child was in need of care. In considering this issue, we view the evidence in the light favoring the State to determine whether there was clear and convincing evidence from which a rational fact-finder could find Mother's youngest child in need of care. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

11

The district court's journal entry and order of adjudication shows that the district court adjudicated the youngest child to be in need of care under K.S.A. 2017 Supp. 38-2202(d)(2), which requires clear and convincing evidence that the child was "without the care or control necessary for the child's physical, mental, or emotional health."

The evidence shows that this child was one year old at the time the CINC petition was filed. The child was in need of constant care and completely depended on those around him for his physical needs. Mother insisted throughout the DCF investigations that she was the only person who was available to care for her children. Mother has a drug problem that she failed to address. She tested positive for morphine at a time when she knew she could be tested as part of the DCF investigation, demonstrating that she was not able to control her addiction. She admitted that she had a problem with morphine and obtained her drugs without a prescription. She used methamphetamine and prescription pain killers while she was pregnant with her youngest child and after he was born. She considered her use of methamphetamine to be no big deal. Her child was exposed to methamphetamine at a level that caused him to test positive in a hair follicle test. He either had to have been exposed to methamphetamine for a prolonged period of time or had to have ingested the drug in order to test positive.

As stated in *In re A.M.*, No. 106,890, 2012 WL 2925660, at \*6 (Kan. App. 2012) (unpublished opinion), "a CINC case is not about the drug user, it is focused entirely on the care and well-being of the child." In *In re L.C.W.*, 42 Kan. App. 2d 293, 301, 211 P.3d 829 (2009), this court cited with approval the district court's comments:

> "'Just because parents use drugs, or have been convicted of using drugs, or drink too much alcohol, does not automatically mean the child is likely to sustain harm, or the home is contrary to the child's welfare. If that were the test, then thousands of children would be removed from the home weekly.'"

12

But here, Mother's drug use was shown to have affected the wellbeing of her child. As the sole person responsible for the child's care, Mother failed to protect her child from exposure to illegal, dangerous, and highly addictive drugs both before and after the child's birth. Mother rebuffed the efforts of various DCF investigators to help her deal with her addition. She considered her drug problem to be no big deal. The evidence established that Mother's drug problem and her attitude about it was not likely to change in the future and that there is a significant danger that Mother will further subject her child to drugs if the State did not intervene to protect her child. We find sufficient evidence to support the district court adjudication of this child to be a CINC.

*Sufficiency of the Evidence that Mother's Two Older Child were also CINC*

For her final issue, Mother claims there was insufficient evidence to support the adjudication that her two older children also were in need of care. The district court did not find that the youngest child had been physically, mentally, or emotionally neglected or abused in order to form the basis for finding the older children also to be in need of care.

We apply the review standard discussed earlier: We view the evidence in the light favoring the State to determine whether there is clear and convincing evidence to support the finding that these older children were also in need of care. See *In re B.D.-Y.*, 286 Kan. at 705. Our review of the statutory requirement for a CINC determination is a matter of law which we review de novo. *In re Miller*, 289 Kan. 218, 225, 210 P.3d 625 (2009).

K.S.A. 2017 Supp. 38-2202(d)(11) provides that a child in need of care is

"a person less than 18 years of age at the time of the filing of the petition or issuance of the ex parte protective custody order . . . who . . . has been residing in the same residence

13

with a sibling or another person under 18 years of age, *who has been physically, mentally or emotionally abused or neglected, or sexually abused*." (Emphasis added.)

The district court used this provision as the sole basis for finding Mother's two older children also to be in need of care.

The court used a standard form check-the-box journal entry in adjudicating the youngest child to be in need of care. That form sets forth the various statutory grounds for adjudicating a child to be in need of care. The court checked the box "is without the care or control necessary for the child's physical, mental, or emotional health" in finding the youngest sibling to be in need of care. Immediately following is another box that states: "[H]as been physically, mentally or emotionally abused or neglected, or sexually abused." This box was not checked.

There is no evidence that the two older children were in any way abused or neglected while in Mother's care. When DCF staffed an earlier investigation in July 2016, the report noted that there was nothing to indicate there was a direct concern for the safety of these children. The investigator found them healthy and well taken care of when she saw them. When the investigator saw the older children in April 2017, she found them to be healthy, happy, and neither child was aware of Mother's drug use. The hair follicle tests on the two older children were negative for any drugs.

The district court found that the two older children were in need of care solely because they lived at home with their one-year-old sibling who was found to be a CINC. But in order to invoke this statutory basis for a CINC determination, the court had to find that the youngest sibling had been adjudicated a CINC because he had been "physically, mentally or emotionally abused or neglected, or sexually abused." The district court made no such finding to support its determination that the older children were also in need of care.

14

The State argues that the district court never expressly designated which subsection it was using to designate the younger child a CINC and no party objected to the vagueness of this finding. Thus, we should presume that the district court made the factual findings necessary to support its decision.

The problem with this argument is that the district court *did* make a specific finding in its journal entry that the youngest child was a CINC because he was "without the care or control necessary for the child's physical, mental or emotional health." There is nothing vague about this finding.

This is not a criminal case in which the court's pronouncements from the bench control. This is a civil case. The findings and conclusions necessary to support a judgment are controlled by the language of the journal entry of judgment, not the judge's oral pronouncements from the bench. See K.S.A. 2017 Supp. 60-258; see also *Einsel v. Einsel*, No. 109,367, 2014 WL 1795993, at *2 (Kan. App. 2014) (unpublished opinion).

While the journal entry does not identify the specific subsection of the statute, it contains the exact language of the subsection of the statute the court selected in determining that the youngest child was in need of care. The problem with an inadequate or vague finding is the difficulty an appellate court has in conducting a meaningful review of the district court's ruling. We are not confronted with that problem in this case.

Simply put, the only stated basis for declaring the older children to be in need of care was that they reside with a sibling who had been found to be a CINC because he was "without the care or control necessary for the child's physical, mental or emotional health." This finding is inadequate for invoking this provision of the statute which is predicated on the sibling who is a member of the household having been "physically, mentally or emotionally abused or neglected, or sexually abused." The youngest child

15

was not found to have been "physically, mentally or emotionally abused or neglected, or sexually abused." He was found to be in need of care for a different reason.

Accordingly, we find insufficient evidence to support the finding that the older children were in need of care, and we set aside that adjudication.

Affirmed in part, reversed in part, and dismissed in part.

16